**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 13-cv-01663-MSK-BNB

PDC PHARMACY COLORADO, INC.,

      **Plaintiff,**

v.

MCKESSON CORP., and
INDEPENDENT PHARMACY COOPERATIVE, INC.,

      **Defendants.**

---

**OPINION AND ORDER DENYING MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

---

**THIS MATTER** comes before the Court pursuant to the Plaintiff's Motion for

Temporary Restraining Order and Preliminary Injunction (**# 3**).

According to the Verified Complaint (**# 1**), the Plaintiff operates the Goose Creek

Pharmacy ("Goose Creek") in Boulder, Colorado.  Due to Goose Creek's proximity to pain

management clinics, an unusual volume -- approximately 30% -- of Goose Creek's prescription

sales involved drugs designated as controlled substances under Federal law.  Goose Creek

obtains its supplies of controlled substances pursuant to a somewhat complex contractual

agreement with Defendant Independent Pharmacy Cooperative, Inc. ("IPC") and Defendant

McKesson Corp.[1]

---

[1]     Although a full appreciation of the arrangement is not necessary for resolution of the
instant issue, it appears that Goose Creek and other pharmacies enter into a contractual
agreement with IPC containing certain provisions, and IPC enters into a contractual agreement
with McKesson containing additional provisions.  For practical purposes, Goose Creek (and
other pharmacies) and McKesson are expressly designated as third-party beneficiaries to the

On June 17, 2013, a representative of McKesson contacted Goose Creek, stating that McKesson would no longer be providing Goose Creek with controlled substances, effective the following day.  According to the Complaint, McKesson's stated reason for terminating the arrangement was that Goose Creek had, in filling its customers' prescriptions, "exceeded certain . . . ratios of controlled substances to non-controlled substances," although Goose Creek contends that McKesson refused to identify the source or content of such ratios.[2]  Goose Creek wrote to McKesson, contending that its termination of supplies breached the parties' agreement and requested that McKesson continue supplying the controlled substances for a 30-day period, during which Goose Creek could obtain an alternative supplier. On June 24, 2013, McKesson responded, stating that it was invoking its contractual right to immediately cease supplies "in the event McKesson feels that it may be in jeopardy of being noncompliant with established laws and regulations."

Goose Creek then commenced this action, asserting a single claim for breach of contract. In the instant motion, Goose Creek seeks (**# 3**) a temporary restraining order, pursuant to Fed. R. Civ. P. 65(b), and a preliminary injunction pursuant to Fed. R. Civ. P. 65(a), "requiring McKesson Corporation to continue filling [Goose Creek's] for [ ] pharmaceutical products and merchandise, including but not limited to controlled substances, as those terms are defined in the McKesson agreement, until such time as [Goose Creek] is receiving controlled substances from

---

agreements they are not directly involved with, and thus, it is possible – albeit not necessarily precise – to describe Goose Creek and McKesson as parties to a consolidated contract containing all of the terms of the Goose Creek – IPC and all of the terms of the IPC –McKesson contracts.

[2]     Exhibits attached to the Complaint indicate that McKesson first expressed concern about the prescription mix to Goose Creek in May 2013.  Goose Creek states that, in response to those concerns, it "adopted enhanced protocols to ensure that [its] provision of controlled substances is proper."

another provider."[3]  Although the relief requested by Goose Creek is open-ended, it indicates in

its motion that "it is expected that a new supplier will start providing controlled substances to

Goose Creek by July 3, 2013."  Goose Creek states that its has already begun to run out of

supplies of controlled substances and has turned away some customers seeking to refill their

prescriptions, and that by June 28, 2013, its supplies will be completely depleted and it will be

forced to direct customers to fill their prescriptions elsewhere.  it contends that, given "prevailing

customs in the retail pharmacy industry, it is highly unlikely that customers who transfer

prescriptions to another pharmacy will ever return their business to Goose Creek."  Thus, it

argues that, if provisional relief is not granted, it will suffer irreparable harm in the form of "(i)

loss of customer goodwill and reputation for reliability; (ii) loss of current and future customers;

and (iii) the threatened loss of the financial viability of the Goose Creek Pharmacy."

     A party seeking an *ex parte* temporary restraining order under Rule 65(b) must first make

a threshold procedural showing consisting of: (i) an affidavit or verified complaint demonstrating

that immediate and irreparable injury will result before the adverse party can be heard in

opposition; and (ii) the movant's attorney "certify[ing] in writing any efforts made to give notice

and the reasons why it should not be required."  Fed. R. Civ. P. 65(b)(1)(A), (B).  Assuming that

the procedural showing is made, the Court may also consider whether the traditional preliminary

injunction factors are present, namely: (i) the potential for imminent and irreparable harm to the

movant; (ii) the movant's likelihood of success on the merits; (iii) the potential harm to the

movant if relief is denied outweighing the harm to the non-movant that may result if the request

is granted; and (iv) that the requested relief would not result in harm to the public interest.

---

[3]     McKesson's letter to Goose Creek indicates that McKesson was refusing to continue
supplying Goose Creek with controlled substances.  It is not clear whether McKesson continues
to supply Goose Creek with pharmaceutical supplies other than controlled substances, or, if not,
Goose Creek's ability to promptly obtain an alternative supplier for such merchandise.

*Goldenhersh v. Aurora Loan Servs.,* 2012 WL 2890924 (D. Colo. Jul. 16, 2012) (slip op.);

*Schrier v. University of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005).

The Court finds that Goose Creek has nominally complied with the requirements of Rule 65(b)(1)(A).  Its Complaint is verified by Eric Folino, Executive Vice President of Goose Creek's "parent company," and that Complaint does assert Goose Creek's belief that it will lose customer goodwill (and potentially face financial ruin) if its supplies deplete.  It has not, however, complied with Rule 65(b)(1)(B), as its attorney has not certified the steps it has taken to give notice of this motion to the Defendants, nor set forth the reasons why such notice should be excused.  Nevertheless, that omission is largely a technical one; it can reasonably be assumed that if Goose Creek will suffer its alleged irreparable harm upon the depletion of its supplies on June 28, 2013, it is not practical to require that the Defendants be given an opportunity to be heard in opposition, as it is likely that the time necessary for the Defendants to complete a meaningful response will extend beyond June 28, 2013.  Accordingly, the Court will overlook Goose Creek's failure to comply with Rule 65(b)(1)(B).

Nevertheless, the Court finds that it is appropriate to deny the requested temporary restraining order, finding that Goose Creek's showings on each of the traditional preliminary injunction factors is insufficient.

Irreparable harm

Turning first to the question of whether Goose Creek will suffer an irreparable harm if immediate relief is not granted, a party attempting to show an "irreparable injury" must demonstrate "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages."  *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011).  Purely economic loss "is usually insufficient to constitute irreparable harm," as

economic losses can readily be compensated with monetary damages. *Id.*; *Schrier*, 427 F.3d at 1267.

It appears to the Court that much of Goose Creek's potential injury is readily quantifiable and compensable in damages. By its own admission, Goose Creek will be able to replace McKesson as a supplier of controlled substances by July 3, 2013, and the Court will assume that the new supplier will provide controlled substances of the same quality, such that Goose Creek's business operations after July 3, 2013 will be effectively indistinguishable from its past operations. To the extent that the new supplier charges higher prices than McKesson, that differential is readily compensable in economic damages.

Goose Creek contends that "loss of customer goodwill" (in both current and potential customers) that will occur between June 28 and July 3 is a type of injury that resists ready computation and is thus irreparable. *Citing Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256, 1263 (10th Cir. 2004) *and Guidance Endodontics, LLC v. Dentsply Intl. Inc.*, 633 F.3d 1257, 1277 (D.N.M. 2008). Although courts recognize that the loss of goodwill is a type of injury that <u>can</u> be irreparable in the proper circumstances, there is no categorical rule that a loss of customer goodwill <u>always</u> constitutes irreparable injury. Often, the loss of goodwill is associated with other factors that render such injuries incapable of monetary redress, such as difficulties in calculating damages arising from the loss of such goodwill. *See Dominion Video*, *id.*

Here, however, the peculiar circumstances faced by Goose Creek make it far easier to quantify the loss of any customer goodwill that will result in the brief period in which Goose Creek is left without a supplier or inventory of controlled substances. Among other things, the Complaint explains that: (i) controlled substances comprise 30% Goose Creek's prescriptions;

(ii) Goose Creek fills, on average, approximately 50 prescriptions a day; (iii) it prohibits customers with controlled substance prescriptions from re-filling those prescriptions before the 28th day of a 30-day prescription; and (iv) it is not accepting new patients with controlled substance prescriptions unless that new customer is filling a vacancy left by the departure of another customer with such a prescription. Combined, these factors make it relatively simple to estimate the amount of lost customer goodwill that might result from a brief suspension of Goose Creek's ability to fill controlled substance prescriptions. Numerically, given a rate of approximately 50 prescriptions filled per day and an average of 30% of those prescriptions being for controlled substances, it appears that Goose Creek will fail to fill approximately 75 controlled substance prescriptions during the five day period between exhausting its supplies on June 28 and it acquiring a new supplier on July 3. Moreover, given that Goose Creek will only refill controlled substance prescriptions after the 28th day of a customer's prior prescription, it should be of little difficulty for Goose Creek to ascertain from its own records which particular customers will become eligible to refill those prescriptions during the June 28 – July 3. Finally, because Goose Creek does not accept new patients with controlled substance prescriptions until an existing patient with such a prescription has left the business, the potential customer base affected by McKesson's actions is fixed; this is not a situation where Goose Creek could and would fill the prescription of any potential customer who walked in off the street during this period, such that number of lost sales (and new customers) is incalculable. In the ensuing months, it should be of little difficulty for Goose Creek to calculate how many controlled substance prescriptions came due during the June 28 – July 3 period (and were thus referred to other pharmacies), which specific existing customers failed to return in subsequent months to continue to refill their prescriptions (thus, presumably, becoming "customers lost" as a result of

McKesson's conduct), and how many of the openings created by the departure of those controlled substance customers remained unfilled by new controlled substance customers (who would otherwise not have been able to fill prescriptions at Goose Creek).[4]  Thus, unlike many other cases in which the loss of customer goodwill might amount to a irreparable harm, the Court cannot say that in the peculiar circumstances presented by Goose Creek's business model, the loss of revenues or customer goodwill that might result from any unlawful breach of contract by McKesson will be incapable of ready quantification and compensation by money damages.

Goose Creek also argues that it faces a risk of irreparable harm insofar as "if [it] loses the 30 percent of its revenue represented by controlled substance prescriptions, as well as the revenue from non-controlled substance prescriptions filled by controlled substance customers, [it] will quickly incur substantial loses [and] will be forced to go out of business."  The Court finds this assertion to be conclusory and, indeed, somewhat implausible on the current record. As noted above, Goose Creek represents that it is capable of replacing McKesson as a supplier by July 3, and thus, its immediate revenue losses will be limited to the purchases that controlled substance customers would have made during that 5-day period.[5]  The Complaint notes that

---

[4]     The Court acknowledges that there is arguably an ephemeral "loss of goodwill" even with customers who return to Goose Creek after being referred to a competing pharmacy for one round of prescription refills, insofar as those customers might return to Goose Creek but lose some small measure of confidence in Goose Creek's reliability. Given the relatively small number of persons potentially affected by the short disruption in Goose Creek's supply presented here, the Court does not find this potential loss, even if irreparable, to be significant enough to warrant provisional injunctive relief.

[5]     Although this assertion appears in both the Complaint and motion for injunctive relief, the Court does not necessarily understand Goose Creek to be contending that the brief 5-day supply disruption, if allowed to occur, will be the death knell of the business.  Rather, the Court understands Goose Creek to assert that, if the supply disruption continues for some extended period of time, it may be forced out of business. *Complaint*, ¶ 16 ("If, however, Goose Creek loses the 30 percent of its revenue represented by controlled substance prescriptions . . . Goose

Goose Creek "has operated at a slight loss during the current fiscal year," but that "over the three months preceding McKesson's breach . . ., Goose Creek has generated a profit."  Under these circumstances, it seems extremely unlikely that a 5-day loss of a portion of Goose Creek's revenues will cause it to shut down operations completely.

Accordingly, the Court finds that Goose Creek has not shown that it faces a risk of a substantial irreparable harm if the requested temporary restraining order is not granted.

Likelihood of success

Although the lack of a substantial irreparable harm is itself enough to warrant denial of the relief requested, the Court will briefly address the remaining factors.  Turning to the question of a likelihood of success on the merits, Goose Creek argues that under Paragraph 19 of IPC's agreement with McKesson, McKesson must deliver written notice of any breach to Goose Creek, and then allow Goose Creek at least five days to cure that breach; if the breach remains uncured, McKesson may then terminate the agreement on five additional days' notice.  The Complaint alleges that McKesson did not give written notice of any alleged breach by Goose Creek until June 24 (at the earliest, although Goose Creek alleges that even McKesson's letter of that date is insufficient to constitute the notice required by the contract) and thus, that McKesson has breached the agreement by terminating supplies as of June 18.

However, Goose Creek also acknowledges that the same contract contains an additional provision at Paragraph 26(b) that provides that "in the event that performance of the terms of this agreement would cause McKesson to be noncompliant with or in jeopardy of being noncompliant with any federal, state  or local law, rule, regulation or ordinance or any government requirement, guideline or pronouncement involving controlled substances  . . .

Creek will quickly incur substantial losses . . . and the Goose Creek pharmacy will be forced to go out of business.")

McKesson shall have the right, within its sole and absolute discretion, to . . limit or deny any order for controlled substances . . . ."  Although the record is incomplete on Goose Creek's current *ex parte* application, it is clear from McKesson's June 24, 2013 letter that it was invoking the provisions of Paragraph 26, in that it "feels it may be in jeopardy of being noncompliant with established laws and regulations." Because Paragraph 26 gives McKesson "absolute discretion" to essentially terminate all future supplies of controlled substances if Goose Creek's actions placed McKesson "in jeopardy" of being noncompliant with any regulation, Goose Creek is likely to succeed on this action only upon a clear showing that its conduct <u>did not</u> place McKesson in any jeopardy of running afoul of any law or regulation.

Certainly, Goose Creek takes the position that its practices did not place McKesson in any such jeopardy.  But the record is not necessarily clear-cut on this point.  Goose Creek's June 20, 2013 letter to McKesson acknowledges that McKesson has had concerns about Goose Creek's operations since at least May 2013, and that Goose Creek adopted, at "McKesson's inquiry and suggestion," "enhanced protocols to ensure that Goose Creek's provision of controlled substances is proper."  Without attempting to prejudge the merits of the case on the skeletal and incomplete record presented here, the Court is content to observe that: (i) McKesson is contractually-permitted to unilaterally (and apparently without prior notice)[6] terminate controlled substance deliveries to Goose Creek if certain, somewhat vaguely-defined ("in jeopardy of") criteria are met; and (ii) McKesson had recently expressed concerns about Goose Creek's operations and requested Goose Creek to modify the nature of its business to address such concerns.  Under these circumstances, it may be that Goose Creek can ultimately

---

[6]      Goose Creek appears to argue that McKesson's invocation of rights under Paragraph 26 nevertheless entitle Goose Creek to the notice and cure period of Paragraph 19.  Nothing in either paragraph supports that conclusion.

demonstrate that McKesson's claimed concerns are unfounded, but on the record presented here, the Court has some reservations in finding that Goose Creek is likely to succeed on the merits of its breach of contract claim.

Balance of harms and the public interest

The Court also has some doubt that Goose Creek has shown (or can show) that the balance of equities tips in its favor and that the relief it requests is not adverse to the public interest.  In balancing the equities, the Court observes that Goose Creek's injuries are largely economic in nature and, as discussed above, likely entirely compensable with monetary damages.  Although allowing Goose Creek's supply of controlled substances to run dry will result in some inconvenience to its customers, Goose Creek acknowledges that it will be possible for its customers to fill their prescriptions at other pharmacies, and thus, there is little consequential harm to others that will result from denying the requested injunction.  On the other hand, the record indicates that McKesson has some concerns that continuing to supply Goose Creek with controlled substances places McKesson at risk of potential noncompliance with controlled substances laws or regulations.  This potential risk of legal or regulatory harm to McKesson from continued servicing of Goose Creek is at least as significant as Goose Creek's purely economic harm, such that the balance of the equities is, at the very best, in equipoise.

Moreover, the Court notes the strong public interest in the strict control over the distribution of controlled substances, as evidenced by the myriad of state and federal statutes and regulations governing that field.  Depriving Goose Creek of access to such substances for a brief period will not harm the public in any meaningful way – as noted above, customers with prescriptions can still obtain their medicine elsewhere during the 5-day period – but requiring McKesson to continue supplying Goose Creek in circumstances where there is some concern

over legal compliance suggests that the injunction requested by Goose Creek could pose a risk of harm to the public interest.

Accordingly, Goose Creek's Motion for Temporary Restraining Order **(# 3)** is **DENIED**. Ordinarily, the Court would next set the matter down for a hearing to address the issues underlying the request for a preliminary injunction and, if necessary, proceed to conduct an evidentiary preliminary injunction hearing.  But, given the circumstances presented here, it appears such action would be futile.  By its own admission, Goose Creek will have resumed its supply of controlled substances through an alternative supplier by July 3, rendering the need for further injunctive relief after that date moot.  The Court's schedule ensures that it would be unable to fully adjudicate a preliminary injunction motion prior to that date.   Accordingly, the Court **DENIES,** without prejudice, Goose Creek's motion to the extent it also requests a preliminary injunction.  Should the circumstances change, such that a preliminary injunction remains appropriate relief, Goose Creek is free to make a new, adequately-supported request for such relief.

Dated this26th day of June, 2013.

**BY THE COURT:**

_____

Marcia S. Krieger
Chief United States District Judge

11